MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendant
By: SERRIN TURNER (ST-0646)
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Tel. No.  (212) 637-2701
Fax. No. (212) 637-2686

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
:
JOHN L. CILENTO,                                       :
:
                Plaintiff,                    :
:
     v.                                            :      05 Civ. 6243 (CLB) (GAY)
:
MICHAEL CHERTOFF, Secretary              :      **ELECTRONICALLY FILED**
of the Department of Homeland Security,  :
:
                Defendant.                    :
:
------------------------------------------------------x

## RULE 56.1 STATEMENT IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Michael Chertoff, Secretary of the Department of Homeland Security, by his attorney Michael J. Garcia, United States Attorney for the Southern District of New York, submits the following Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment, as follows:

1. Plaintiff is a white Italian-American male 52 years of age.  Compl. at 3.

2. On May 18, 2002, plaintiff applied to CBP Vacancy Announcement CH138958, for the position of Customs Inspector or Canine Enforcement Officer.

Declaration of Jerry Tavenner, Supervisory Human Resources Specialist ("Tavenner Decl."), ¶ 4 & Exhs. A & B.

3. The application for the announcement could be completed via phone or Internet. Tavenner Decl. ¶ 2. Plaintiff completed it on the Internet. Deposition of John L. Cilento ("Cilento Dep.") at 19:22-24, attached as Exh. B to Declaration of Serrin Turner (Turner Decl.).

4. The telephonic application script was prepared by CBP and is attached as Exhibit B to the Tavenner Declaration. The Internet script was prepared by the Office of Personnel Management based on the telephonic script. Tavenner Decl. ¶ 3. Because the Internet script was not prepared by CBP, CBP does not have records of it; but it was substantively identical to the telephonic script. *Id.* The only difference between the two scripts was that the telephonic script reflected that answers were given by pressing numbers on a telephone, while the Internet script reflected that answers were given by making selections on a computer screen. *Id.*

5. The application script stated: "If you are found to be qualified, your answers will be final and you will not be able to re-enter this system and change your answers or apply for a grade or position for which you did not apply originally." Tavenner Decl. ¶ 4; Cilento Dep. at 22:10-18.

6. The application script explicitly forewarned applicants that, before proceeding to complete the application questions, "you need to decide if you are willing to accept a position at the GS-5 grade level." Tavenner Decl. ¶ 4; Cilento at Dep. 24:2-10.

7. Plaintiff, who had worked for the federal government previously from 1980 to 1985, Cilento Dep. at 16:10-13, was familiar with the GS-level pay system at the time he completed the application, *id.* at 18:8-14.

8. He had decided beforehand that he was willing to accept a position at the GS-5 grade level, and thus he proceeded with the application. *Id.* at 24:11-14.

9. The application began with a number of basic background questions, mainly concerning race, gender, address, Social Security number, and related information. Tavenner Decl. ¶ 5.

10. After completing these questions, plaintiff came to a part of the application prefaced as follows: "We will now ask you questions that will determine your preliminary eligibility for a Customs Inspector position at the GS-7 level." *Id.* The four questions in this part asked whether the applicant had certain educational qualifications or specialized experience required for a GS-7 appointment. *Id.*

11. Although plaintiff found one of these four questions ("GS-7 Question 3") to be ambiguous, plaintiff answered "No" to all four questions, indicating that he did not have any of the qualifications or experience required for a GS-7 appointment. *Id.*; Cilento Dep. at 29:19-32:8.

12. The next part of the application tested eligibility for a GS-5 appointment. It began: "We will now ask you questions that will determine your preliminary eligibility for a Customs Inspector position at the GS-5 level." Tavenner Decl. ¶ 6. Plaintiff answered the first of these questions with a "Yes," which was sufficient to qualify him for a GS-5 position. *Id.*; *see also* Cilento Dep. at 35:5-16.

13. The application script next prompted plaintiff as follows: "Your answers to previous questions indicate that you do not have the experience and/or education to qualify for a Customs Inspector position at the GS-7 level; however, you do qualify at the GS-5 level – subject to verification.  Do you wish to continue your application for a position at the GS-5 level?"  Tavenner Decl. ¶ 7.

14. Plaintiff did not stop to call the Agency to ask for guidance before proceeding further.  Instead, he answered, "Yes."  *Id.*; Cilento Dep. at 36:14-20.

15. Plaintiff at the time understood that, as a result of this answer, he would be considered only for a GS-5 appointment.  Cilento Dep. at 36:21-37:3.  He then completed the rest of the application.  Tavenner Decl. ¶ 8.

16. Four months later, around September 9, 2002, plaintiff received a letter from the Agency informing him that he had passed the written application.  Cilento Dep. at 37:25-38:14 & Exh. 4. The letter provided a number to call concerning "any questions regarding any of the appointment requirements."  Cilento Dep. at Exh. 4.  Plaintiff did not call the number, however, to ask whether he had correctly interpreted GS-7 Question 3.  Cilento Dep. at 38:25-39:3.

17. Plaintiff subsequently interviewed for the position.  Cilento Dep. at 39:25-40:3.  At his interview, he stated to the interviewers that he believed that he qualified for a GS-7 appointment. *Id.* at 41:16-42:3.  According to plaintiff, the interviewers told him that, when he was hired, "that [issue] would be negotiable at that point," or at least that "it could be." *Id.* at 42:4-6.  However, "they didn't state that they kn[e]w this for sure." *Id.* at 42:9-10.

4

18. Around October 11, 2002, plaintiff received correspondence from CBP containing a record of plaintiff's application for employment.  *Id.* at 44:18-25 & Exh. 6.  Included in the record was a rating of where plaintiff stood relative to other applicants.  *Id.* at Exh. 6.  As to his application for a GS-5 appointment, the letter stated that plaintiff's rating was 88.5.  *Id.*  As to the GS-7 grade level, however, the letter informed plaintiff that "You do not meet the minimum education and/or experience requirements for this specialty and grade."  *Id.*

19. About a year later, plaintiff received a letter informing him that he had been selected for a Customs Inspector position.  *Id.* at 46:21-47:14 & Exh. 7.  The letter listed various details about the position being offered, including the grade level – GS-5.  *Id.* at 47:15-23 & Exh. 7.  The letter stated: "Please note that the grade level and location of the offer have been determined by the selecting official and are not negotiable."  *Id.* at Exh. 7.  Plaintiff understood at this time that he would be hired as a GS-5 and that this determination was final.  *Id.* at 47:24-48:4.

20. Throughout the application process, plaintiff had called CBP a number of times to inquire about the status of his application.  *Id.* at 48:9-13; *see also* Tavenner Decl. at Exh. E (phone log).  Not once during these calls did he raise the issue whether he could be considered for a GS-7 appointment.  *Id.* at 48:14-17.

21. Plaintiff began work on October 20, 2003; he was stationed at Newark Airport.  *Id.* at 48:5-8, 51:12.

22. Plaintiff's hiring papers stated that he was going to be hired as a GS-5, and he signed them without making any objection.  *Id.* at 48:18-49:14.

23. About one month later, plaintiff called CBP's human resources department in Washington, D.C. and was referred to Supervisory Human Resources Specialist Jerry Tavenner.  *Id.* at 51:18-52:4; Tavenner Decl. ¶ 12.  Plaintiff told Mr. Tavenner that he felt that he deserved to be paid at the GS-7 level.  Tavenner Decl. ¶ 12 & Exh. C.  He explained that he "probably made a mistake on the application" and asked whether the mistake could be corrected after the fact.  Cilento Dep. at 52:22-53:11.  Mr. Tavenner explained to plaintiff that his GS level was based on the answers he gave during his application and that those answers could not be changed after the fact.  *Id.* at 53:24-54:8; Tavenner Decl. ¶ 11 & Exh. C.

24. The vacancy announcement for which plaintiff was selected was announced and filled pursuant to the Federal Career Intern Program hiring authority.  Tavenner Decl. ¶ 9.  Pursuant to this authority, applicants were rated based on written test results and referred for consideration on a "certificate of eligibles," in which applicants were listed together, in order of their ratings.  *See id.*

25. Separate certificates were prepared for GS-5 and GS-7 applicants.  *See id.* Thus, applicants who qualified themselves as GS-5s were listed on one certificate, while applicants who qualified themselves as GS-7s were listed on another.  *Id.*

26. In filling vacancies from a certificate of eligibles, selecting officials were required to consider applicants in the order listed on the certificate, applying the "rule of three" hiring protocol.[1]  *Id.* ¶ 10.

---

[1] Under this protocol, selecting officials were required to make their selection for each vacancy from the highest three names available on the certificate.  *Id.*  After one name was chosen, the highest three remaining names could be considered for the next appointment.  *Id.*  Any applicant considered three times could be removed from the list. *Id.*

6

27. It was the Agency's policy not to allow applicants to change their application answers once their application had been submitted.  *Id.* ¶ 11.

28. This is why Mr. Tavenner refused plaintiff's request.  *Id.* ¶ 12.

29. Plaintiff contacted Mr. Tavenner again by email on February 9, 2004, with essentially the same request as before: he said that he had misunderstood a question on the application and asked that his pay grade be upgraded to reflect the answer he would have given had he understood the question correctly.  Cilento Dep. at 59:14-60:2; Tavenner Decl. ¶ 13 & Exh D.

30. Plaintiff added, "I understand that at least two individuals in the recent past with the same problem have appealed their case to you and were given a GS-7 rating." Tavenner Decl. at Exh. D.  However, plaintiff did not specify who these individuals were; and, in fact, his "understanding" was based merely on a vague and perfunctory conversation with a supervisor.  *Id.* at 67:18-70:13.

31. In a response email, Mr. Tavenner again denied plaintiff's request, explaining:

> John: I reviewed your application record.  As you indicated, you only self-certified as a GS-5.  Therefore, the only grade for which you may be considered is the GS-5.  Briefly, you competed with other folks at the GS-05 level and you were selected based on your referral on a GS-5 certificate of eligibles.

Tavenner Decl. at Exh B.  The email added: "**NO EXCEPTIONS** have been authorized to this policy."  *Id.*

32. Plaintiff contacted Mr. Tavenner once again about six weeks later, asking by email dated March 26, 2004 whether anyone at CBP was authorized to "correct" the mistake he had made in qualifying himself only as a GS-5, or whether there was anyone to whom he could appeal the issue.  Cilento Dep. at 70:18-25; Tavenner Decl. ¶ 14 &

7

Exh. E.  Mr. Tavenner emailed plaintiff back three days later, again answering plaintiff's inquiries in the negative, explaining:

> Since this was an error you made on your application, no one can "correct" it for you.  And once the closing date of the announcement passed, you cannot correct it to allow you to be considered for the higher grade level either.  You can apply to a future announcement and correctly complete the application so that you self certify at a GS-7 level … but odds are, you will have been promoted to the GS-7 level before you would be selected and appointed again at the GS-7 level.

Tavenner Decl. at Exh. E.

33. Sometime during the month following this third exchange with Mr. Tavenner, plaintiff had a brief conversation with one of his supervisors, Ms. Lorraine Spina, in which he brought up his efforts to have his GS level retrospectively changed.  Cilento Dep. at 73:18-74:14.  Ms. Spina relayed that she had initially been hired as a GS-5 but obtained an upgrade to a GS-7 appointment after explaining to the Agency that she qualified for appointment at that grade.  *Id.*

34. Plaintiff assumed that Ms. Spina's circumstance was "very identical" to his own.  *Id.* at 74:15-21, 75:7-18.

35. Plaintiff did not know whether Ms. Spina had certified herself only at the GS-5 level during the application process or whether she was selected under the same application process and hiring rules as he was.  *Id.* at 74:15-21, 75:7-18.

36. Based solely on his brief conversation with Ms. Spina, plaintiff came to believe that he had been discriminated against on the basis of gender and age by not receiving the same GS-level upgrade received by Ms. Spina, who is female and younger than the plaintiff.  *Id.* at 75:21-76:10, 86:5-11.

37. On April 28, 2004, plaintiff contacted an EEO Officer.  *Id.* at 85:20-86:1.

38. After consulting with the EEO Officer, plaintiff agreed to enter into mediation, which occurred on July 22, 2004. *Id.* at 91:3-9.

39. At the mediation, the parties agreed on proposed terms of a compromise. Under the proposed terms, plaintiff would receive an upgrade to a GS-7 pay grade if he indeed had the appropriate qualifications and had performed well since his hire, but the upgrade would be prospective only and would not date back to his date of hire. *Id.* at 99:13-100:11, 101:14-21.

40. In effect, given that plaintiff was already expected to receive an upgrade to a GS-7 pay grade in the ordinary course in October of 2004, the proposed terms called for plaintiff to receive the upgrade roughly three months ahead of when he would have received it anyway. *Id.* at 101:22-102:6.

41. The proposed terms were never reduced to writing, *id.* at 101:8-11, and plaintiff had been advised in advance that nothing that happened during mediation would be binding unless and until it was reduced to writing and signed by the parties, *id.* at 92:14-18.

42. Although plaintiff left the mediation session with the impression that the proposed GS-level upgrade would be processed by his next pay period, the EEO Officer cautioned him that given "government red tape," he should give it 30 days to go through. *Id.* at 96:24-97:10, 105:16-20, 122:21-123:3.

43. Exactly 31 days later, on August 23, 2004, plaintiff contacted the EEO Officer and inquired about the status of the proposed GS-level upgrade. *Id.* at 110:22-111:3, 123:4-8. The EEO Officer inquired in turn, and called plaintiff back to inform him that the upgrade had not yet been put in for processing. *Id.* at 111:4-9, 123:9-17.

44. The EEO Officer did not indicate in any way that the upgrade would not eventually be processed. *Id.* at 123:15-125:2.

45. Plaintiff did not attempt to follow up to see what the problem was or otherwise attempt to resolve the issue administratively. *Id.*

46. Instead, plaintiff told the EEO Officer that he wished to reinstate his discrimination complaint (which he had withdrawn shortly after the mediation session). *Id.* at 111:8-13.

47. By this time, plaintiff had had a discussion with an African-American co-worker named Caryl Johnson. *Id.* at 79:24-80:8. During this discussion, plaintiff understood Mr. Johnson to say that he had originally been hired as a GS-5 and upgraded to a GS-7 shortly after being hired. *Id.* at 81:6-82:13.

48. Plaintiff assumed that Mr. Johnson's situation was similar to his own; he did not know whether Mr. Johnson had self-certified only as a GS-5 during the application process. *Id.* at 82:14-23.

49. On September 7, 2004, he sent an email to the EEO Officer requesting that a racial discrimination claim be added to his complaint in addition to his age and gender claims. *Id.* at 113:21-114:22 & Exh. 16.

50. On October 6, 2004, plaintiff filed a formal discrimination complaint with DHS, alleging that Mr. Tavenner had discriminated against him by denying him the opportunity to correct his application answers and increase his pay grade retroactively. *Id.* at 114:23-115:14 & Exh. 17 at 3.

51. This administrative complaint was dismissed by DHS on November 29, 2004. *See* EEOC Decision in Appeal No. 01A51905, attached to Compl., at 1. Plaintiff

subsequently appealed the dismissal to the EEOC, which affirmed the dismissal on April 5, 2005.  *Id.* at 1, 3.

52. Lorraine Spina requested and received a correction to her GS level after her hire, from a GS-5 to a GS-7.  Tavenner Decl. ¶ 17.

53. Unlike plaintiff, Ms. Spina did not disqualify herself for a GS-7 appointment in her application materials.  Her application indicated she had specialized experience sufficient to qualify her for a GS-7 appointment.  *Id.*

54. So, her GS-level upgrade was a correction of an oversight by the Agency, rather than a mistake made by Ms. Spina herself on her application.  *Id.*

55. Further, unlike plaintiff, who was appointed under the Federal Career Intern Program ("FCIP"), Ms. Spina was appointed under the Veterans Readjustment Appointment Act of 1974 ("VRA").

56. Applicants selected under the VRA were not considered on the basis of any ordered numerical rating but instead were considered according to veterans' preference category alone.  *Id.*

57. Also, unlike the FCIP, the VRA did not require the Agency to announce the position for which Ms. Spina was hired.  *Id.*

58. Accordingly, Ms. Spina's GS-level could be corrected after her hire without unfairly prejudicing other applicants.  *Id.*

59. Mr. Johnson applied for the same position as plaintiff and was selected under the same hiring authority, but, unlike plaintiff, Mr. Johnson did not certify himself only as a GS-5 during the application process; he certified himself as a GS-7.  Tavenner Decl. ¶ 19.

60. Moreover, Mr. Johnson was originally *hired* as a GS-7; he never had to request an *upgrade* to a GS-7 position at all. *Id.*

By submitting this statement, defendant does not waive his right to contend that any of the above-referenced facts are not material to the present action.

Dated:     New York, New York
           February 24, 2006

                                    MICHAEL J. GARCIA
                                    United States Attorney for the
                                    Southern District of New York
                                    Attorney for Defendant

                              By:      /s/ Serrin Turner        _
                                    SERRIN TURNER (ST-0646)
                                    Assistant United States Attorney
                                    86 Chambers Street
                                    New York, New York 10007
                                    Tel: (212) 637-2701
                                    Fax: (212) 637-2686

12